CITY OF CLEVELAND, Plaintiff,

v.

The CLEVELAND ELECTRIC ILLUMINATING COMPANY, Defendant.

Civ. A. No. C75–560.

United States District Court,
N. D. Ohio, E. D.

Oct. 20, 1980.

Supplemental Opinion Oct. 31, 1980.

William B. Norris, Hahn, Loeser, Freedheim, Dean & Wellman, James E. Young, Thomas E. Wagner, Director of Law, City of Cleveland, Cleveland, Ohio, for plaintiff.

John Lansdale, James P. Murphy, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

This matter is presently before the Court on a series of motions advanced by the defendant The Cleveland Electric Illuminating Company (CEI) pursuant to Rule 50(a), Fed.R.Civ.P., whereby CEI seeks a determination that dismissal of the plaintiff's cause, in whole or in material part, is warranted on the grounds of insufficient proof. The Court, in the course of proceedings conducted on October 16, 1980, permitted extensive oral argument on the defendant's various assertions. *See* Transcript at pp. 4730–4909.

In passing on the defendant's motions, the Court is fully cognizant of the standards governing the application of Rule 50, Fed.R.Civ.P. As succinctly stated by the Sixth Circuit Court of Appeals in *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–1105 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979):

> The issue raised by a motion for a judgment n.o.v. is whether there is sufficient evidence to raise a question of fact for the jury. *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir. 1975). This determination is one of law to be made by the trial court in the first instance. *Id.* In determining whether the evidence is sufficient, the trial court may neither weigh the

evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. *See Gillham v. Admiral Corp.*, 523 F.2d 102, 109 (6th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976). If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. *Id.* at 109; *Reeves v. Power Tools, Inc.*, 474 F.2d 375, 380 (6th Cir. 1973); 9 Wright & Miller, Federal Practice and Procedure § 2524 (1971).[1]

*Accord: Milstead v. International Brotherhood of Teamsters*, 580 F.2d 232, 235 (6th Cir. 1978). *See Pergola v. Pennsylvania R. R. Co.*, 311 F.2d 837, 838–839 (6th Cir. 1963); *Patrick v. South Central Bell Telephone Co.*, 641 F.2d 1192, at p. 1197 (6th Cir. 1980).

Mindful of the foregoing principles, the Court undertakes to assess the defendant's various contentions, considering in the first instance the relevant product market. As is apparent from the City's Trial Brief of September 2, 1980, the plaintiff has asserted that there exists for purposes of this controversy three separate and distinct relevant product markets, namely, a regional power exchange market, a wholesale firm power market and a retail firm power market. The Court, for the reasons outlined more fully below, is persuaded by its review of the record and the governing authorities that the evidence adduced at trial fails to support the existence of either a power exchange or a wholesale market herein, and thus compels the conclusion that the sole relevant product market is the sale of retail firm electric power.

It is beyond peradventure that the plaintiff in an antitrust action bears the burden of defining and proving the relevant product market charged to have been monopolized in violation of § 2 of the Sherman Act. *United States v. E. I. DuPont DeNemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978); *Cf. United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). And, meeting this burden is "a necessary predicate" for establishing a claim under the antitrust laws. *See e.g., United States v. E. I. DuPont DeNemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *Fount-Wip, Inc. v. Reddi-Wip, Inc., supra.*

In assessing the sufficiency of plaintiff's proof in support of its relevant market contentions, the Court's attention is directed initially to the pronouncements of the United States Supreme Court in *United States v. E. I. DuPont DeNemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), wherein that Tribunal thoroughly explored the scope of antitrust product markets, stating:

> In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal.

> \*  \*  \*  \*  \*  \*

The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of

---

1. The fact that the motions at bar are in the nature of motions for a directed verdict, as opposed to the motion for a judgment n.o.v. specifically considered in *Morelock, supra,* is of no consequence here, as the case authorities have recognized that the applicable standards are the same for both procedural devices. *Dulin v. Circle F Industries, Inc.*, 558 F.2d 456, 465

(8th Cir. 1977); *Yazzie v. Sullivent*, 561 F.2d 183, 188 (10th Cir. 1977); *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969); *Neville Chemical Co. v. Union Carbide*, 422 F.2d 1205, 1210 (3d Cir. 1970); 9 Wright and Miller, Federal Practice and Procedure § 2524 at 541–542 (1971).

products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.

*Id.* 76 S.Ct. 1007–1012. Similarly, in *Brown Shoe Company v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Court again observed:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.

*Id.* 82 S.Ct. at 1523–1524. *See also United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Greater Buffalo Press*, 402 U.S. 549, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971).

Of course, considerations of commodity interchangeability *per se* are not implicated by the present controversy. Nonetheless, implicit in the above-referenced criteria and apparent from the case authorities addressed below, are even more fundamental aspects of market existence or definition upon which plaintiff's proof falters.

■ "The basic tests developed by the Supreme Court in defining product and geographic markets only have meaning in the context of transactions between buyer and seller." *American Medicorp, Inc. v. Humana, Inc.*, 445 F.Supp. 589, 597 (E.D.Pa.1977). As explained by the Seventh Circuit Court of Appeals in *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978):

> In determining what constitutes a relevant market for antitrust purposes, the goal is to "delineate markets which conform to areas of effective competition and to the realities of competitive practice."

*Id.* at 710, *quoting in part from L. G. Balfour Co. v. FTC*, 442 F.2d 1, 11 (7th Cir. 1971); *see also FTC v. Rhinechem Corp.*, 459 F.Supp. 785, 788 (N.D.Ill.1978); *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 460 F.Supp. 1151, 1158 (N.D.Ill.1978). Thus, central to a determination of relevant market is proof of the existence or prospect of

meaningful competitive conditions, *see e.g., United States v. E. I. DuPont DeNemours & Co., supra* 76 S.Ct. at 1005–1010, and the authorities have uniformly stressed the importance of demonstrating "the flow of commercial interaction", *Columbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 26 (3rd Cir. 1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979), and the "pattern of competition", *id.* as well as the necessity of "identifying consumer behavior patterns." *Fontana Aviation, Inc. v. Cessna Aircraft Company, supra* at 1158. No relevant product market can be defined "unless focus is made on particular services and actual commercial transactions between buyers and sellers." *T.V. Signal Co. v. American Tel. & Tel. Co.*, 465 F.Supp. 1084, 1089 (D.S.D.1979), *vacated on other grounds*, 617 F.2d 1302 (8th Cir. 1980).

■ Apparent from the foregoing authorities is the fundamental principle that the Sherman Act concept of relevant product market is properly defined with reference to actual or prospective competition, that is, the existence of two or more firms competing or attempting to compete for the opportunity to serve or supply an existing or prospective group of identifiable consumers.

■ Applying this criteria, and appraising the evidence in light of the "commercial realities of the [electrical energy] industry", *Brown Shoe Company v. United States, supra*, 370 U.S. at 336, 82 S.Ct. at 1530; *see United States v. Grinnell Corp., supra*, it is readily apparent that plaintiff's claimed "regional power exchange market" does not, as a matter of law, constitute a separate and distinct "market" within the purview of the Sherman Antitrust Act.

Regional power transactions involve the exchange of electric power between utilities for the purpose of maintaining member firm power supply at the lowest reasonable cost. The "services" of a regional exchange are essentially the use of the most efficient supply available at a given time as among all sources within the exchange. For exam-

ple, an increase in demand for electricity, or "load", within the service area of a given utility which that utility alone could meet only by activating its most expensive peaking units would be satisfied by using power from another system's "baseload" at less cost. Exchange might also occur when a member-owned generating unit is shut down for maintenance purposes, or in an emergency situation. Members of a power exchange coordinate the development of the system to facilitate the most efficient operation of the individual utilities involved. Obviously, the element of cooperative reciprocity (rather than competitive give- and-take) is central to the successful operation of the power exchange.

Plaintiff contends nonetheless that such an arrangement is a "market" composed of buyers and sellers of the "cluster of services" which might be transferred as among member utilities.

In *West-Texas Utilities Co. v. Texas Electric Service Co.*, 470 F.Supp. 798, 821–822 (N.D.Tex.1979), however, the Court rejected a similar contention that a power exchange arrangement among various utilities constituted a relevant product market within the purview of the Sherman Act, emphasizing that the exchange was not "a market where competition occurred, but rather an area of cooperation". *Id.* at 821.

As alluded to hereinabove, the element of competition between potential sellers for the opportunity to serve or supply identifiable buyers is fundamental to and inherent in the criteria for determining the existence of a relevant product market. The plaintiff has produced no evidence to show that as between members of the power exchange in question herein there is competition for the opportunity to "sell" a service to another member when needed. Nor is there any evidence that any member thereof has ever sought to increase the amount of power

"sold" within the exchange. Moreover, the record is utterly devoid of proof that any member-utility has sought to curtail its firm power retail sales so as to "compete" more effectively for the right to supply some other retailer with its cheapest power, provided without charge as to capital expense.

Furthermore, there is no evidence that the demand for power in a power exchange is distinct from consumer demand for firm power. A member of a power exchange would desire "peakload" power only when its firm retail demand required it. "Baseload" power would be desired only when it was more efficient or economical. There obviously can be no "market" at any price for power provided through a power exchange if the participants in the exchange are not in the business of selling firm power to consumers. The "competition" to be used as between generating units in a power exchange, all owned by utilities for the express purpose of providing firm power for sale, does not rise to the level of separate product markets for efficient and inefficient methods of supplying power at a given time.

In summary, the evidence of record in its entirety has failed to demonstrate that the regional power exchange arrangements identified in the Second Amended Complaint were anything other than areas of mutual cooperation or joint ventures among exchange members. The record is certainly devoid of proof even suggesting that exchange members competed with each other, or for that matter with other utilities, to provide the "cluster of services" available to each member utility.[2]

The plaintiff having failed to demonstrate the existence of either actual or potential competition within the arena of regional power exchange transactions, the Court concludes, as a matter of law, that

**2.** While plaintiff accepts the characterization of regional power exchanges as "areas of cooperation," *see* Plaintiff's Reply Brief (filed herein July 14, 1980), rather than competition, it asserts that the inference "that if there is cooperation there is no market is mistaken: all markets are areas of cooperation." Reply Brief at

10 n.5. To accept the notion that competition and cooperation are not relevant distinctions in defining a market because, presumably, buyers and sellers must "cooperate" to consummate a transaction, is to shred the fabric of anti-trust law and to ignore the economic realities of competitive market structure.

the City's claimed "regional power exchange market" does not constitute a product market within the meaning of 15 U.S.C. § 2.

■ Although the record fails to support a separate and distinct power exchange market as such, sufficient evidence has been presented by plaintiff to permit a jury assessment of the City's charge that CEI's unilateral conduct effectively denied the City access to the benefits of coordinated regional power exchange transactions, thereby adversely affecting MELP's ability to compete in the retail power market. *But see infra* at pp. 1316–1318.

■ For slightly different but equally compelling reasons, the Court concludes that plaintiff has failed to adduce evidence sufficient to support the existence of a separate and distinct wholesale power market. As alluded to hereinabove, essential to the existence of an actual or potential product market is the availability of an identifiable group or class of consumers of the commodity offered for sale. In *Brown Shoe Company v. United States, supra,* Chief Justice Warren, in discussing those factors which must be examined in ascertaining the existence of a product submarket, observed that emphasis must be given to "practical indicia" such as "distinct customers" available to purchase the product in question. 82 S.Ct. at 1530. And, in *L. G. Balfour Company v. FTC,* 442 F.2d 1 (7th Cir. 1971), the Seventh Circuit Court of Appeals commented "that any test [of market definition] 'which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful.'" *Id.* at 11 *quoting in part from United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576 (S.D.N.Y.1958); *see also Sargent-Welch Scientific Co. v. Ventron Corp., supra.*

The Court has examined the record in this proceeding, and finds that, with respect to the City's claimed "wholesale power market", the evidence has failed to even suggest the existence of a class of prospective consumers of wholesale power within the relevant geographical area. *See* discussion of geographical market, *infra* at pp. 1313–

1314. In other words, even if plaintiff had been able to generate or obtain bulk power to market on a wholesale basis, the evidence has utterly failed to identify or establish any existing or prospective utilities that might have conceivably purchased that power from the City. Absent a distinct and identifiable body of consumers of a product, there obviously can be no competition in terms of selling the commodity, and hence no "market" within the purview of the Sherman Act.

Moreover, plaintiff's argument advancing the so-called "captive sales" principle is without merit. In this regard the Court finds instructive the reasoning of Judge Young in *Neugebauer v. A. S. Abell Company,* 474 F.Supp. 1053 (D.Md.1979) wherein the Court rejected such an argument under circumstances strikingly similar to those presented by the case at bar. In that case, plaintiff-Neugebauer was a distributor of defendant-Abell's newspapers as well as a retail sales competitor of the defendant. Plaintiff charged Abell with having attempted to " 'squeeze' plaintiff out of the home delivery business by increasing the wholesale price charged for their newspapers." 474 F.Supp. at 1057. Although competition occurred only at the retail distribution level, "plaintiff attempted to prove that the relevant product market was the wholesale newspaper market." *Id.* at 1061. The Court posited:

> The essential fallacy in plaintiff's argument, however, lies in his attempting to define the relevant product market not on the basis of commercial realities such as use and quality of the item but rather on the basis of the distribution system utilized by Abell. If accepted, the logic of plaintiff's argument would mean that the definition of the product market would turn on *how* defendant Abell distributed its product rather than on the nature of what was being distributed. Additionally, plaintiff's theory would premise liability on the presence of two types of alleged monopoly, with monopoly again being defined in terms of the product distribution system. The first mo-

nopoly is that which defendant has over its own product when sold at wholesale. The second monopoly, one which plaintiff has failed to prove, is that acquired in competing with other products in the relevant market. Obviously, by definition, no one competes with Abell at wholesale: plaintiff can purchase Sunpapers for resale only from Abell because no one else makes them.

*Id.* at 1062. In a footnote, the Court disapproved plaintiff's attempts to artificially create a wholesale market comprised in part of defendant's sales of newspapers to itself:

> The real issue raised here is whether plaintiff and Abell actually compete in the newspaper wholesale market. Plaintiff claims that they do and argues that defendant Abell, when selling at retail itself, establishes a stipulated "shadow" wholesale price for its own newspapers. In other words, plaintiff claims that Abell the wholesaler sells Abell papers to Abell the retailer. *See* note 2 supra. Plaintiff must invent such a fictional wholesale price in order to overcome the natural monopoly argument.

*Id.* at 1063 n. 7.

Similarly, the City attempts to define the relevant market for purposes of this case with reference to its characterization of the electrical distribution system employed by CEI. There is no evidence in the record however that defendant "sold" wholesale power to itself for resale nor is there even a scintilla of proof that the parties competed or might have competed in wholesale sales of electrical energy. The City's attempt to create a wholesale market within the parameters of this suit is nothing more than a fictional abstraction without support in either the record or the "commercial realities" of the industry here in issue. *See also United States v. Phillipsburg National Bank*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970).

For the foregoing reasons, the Court finds that plaintiff has failed to adduce evidence which even suggests the existence of a separate and cognizable wholesale power market, and concludes, as a matter of law, that such a market does not exist.

■ Of course, at this juncture of the proceedings there is sufficient proof from which a jury might reasonably infer damage to plaintiff by reason of its inability to purchase PASNY (wholesale) power. However, such a lack of access to alternative sources of wholesale power would only have impacted upon plaintiff's ability to compete in the retail power market, and, for the obvious reasons stated above, could not have affected any attempt on the part of the City to market power on a wholesale basis. The fact that access to wholesale power might be an important element of competition in the retail power market, however, does not compel the conclusion that wholesale power sales comprise a separate and distinct product market within the parameters of the instant controversy.

Defendant further urges that it is entitled to a determination that the relevant geographic market is the thirty-square-mile-area within which plaintiff and defendant actually compete. Plaintiff maintains that the evidence is sufficient to present a jury question as to whether the entire CEI service area, or at least some portion thereof, is one of at least potential competition and thus properly considered in determining the scope of and the injury resulting from the alleged § 2 violations.

■ In ascertaining the scope of the relevant geographic market for Sherman Act purposes, it is incumbent upon the trier of fact to determine "where, within the area of competitive overlap, the effect of the [antitrust violation] on competition will be direct and immediate." *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963); *United States v. Grinnell Corp., supra.* The boundaries of the geographic area, however, must be drawn so as to take into account not only existing but potential competition as well. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

In this regard, the authorities are unanimous in recognizing that an antitrust plain-

tiff need not actually be engaged in a going business in a specific geographic location in order to have Sherman Act standing; "it is sufficient if he has manifested an intention to enter the business [or market] and has demonstrated his preparedness to do so." *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 987 (D.C.Cir.1977), *cert. denied* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Solinger v. A. & M. Records, Inc.*, 586 F.2d 1304, 1309–10 (9th Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *Martin v. Phillips Petroleum Company*, 365 F.2d 629, 632–33 (5th Cir. 1966), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 395–96 (6th Cir. 1962), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); *Peller v. International Boxing Club*, 227 F.2d 593 (7th Cir. 1955); *Laurie Visual Etudes v. Chesebrough-Pond's, Inc.*, 473 F.Supp. 951, 995 (S.D.N.Y.1979); *Huron Valley Hospital v. City of Pontiac*, 466 F.Supp. 1301, 1311 (E.D.Mich.1979); *Magnus Petroleum Co., Inc. v. Skelly Oil Co.*, 446 F.Supp. 874, 880–881 (E.D.Wis.1978), *reversed on other grounds*, 599 F.2d 196 (7th Cir. 1979), *cert. denied*, 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979); *N.W. Controls, Inc. v. Outboard Marine Corp.*, 333 F.Supp. 493, 507 (D.Del.1971). Moreover, in *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 988 n.20 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), the Fifth Circuit Court of Appeals quite appropriately commented:

> [T]he Court does not believe that a going concern, which is the victim of an anticompetitive practice, must forego damages for sales it would have made as the result of the natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase its output. Thus, the question for the Court's determination is whether, under the facts of the present case, the manufacture of units for each type of Volkswagen vehicle in the relevant market can be considered the expansion of a present business into a new market for purposes of standing, or simply one facet of growth in an ongoing business for purposes of damages. The line to be drawn between expansion into new areas and growth in established ones is not easily defined and one that must be determined from the facts of each case.

*Quoted in TV Signal Company of Aberdeen v. American Telephone & Telegraph Co.*, 617 F.2d 1302, 1308 (8th Cir. 1980).

■ The record reflects at least some evidence of plaintiff's efforts to extend its existing retail sales market beyond the aforementioned thirty-square-mile-area, *see e.g.*, Transcript 2805–2810, and the Court is therefore unable to find, at this juncture, that an "intent and preparedness" to extend MELP's geographical service area has, as a matter of law, not been demonstrated or that a "natural expansion" of MELP's existing retail business was not wrongfully frustrated.

Accordingly, defendant's motion is hereby denied insofar as it seeks a directed verdict on the issue of relevant geographic market.

CEI also seeks to avoid the imposition of any liability whatsoever by invoking the established principle that a "monopolist which achieves that status because of 'a superior product, business acumen, or historic accident,' cannot be faulted". *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 853 (6th Cir. 1979), *quoting United States v. Grinnell Corp., supra*. That is to say, CEI currently urges the Court to hold, as a matter of law, that the distribution of electric power at retail within the geographic market here in issue constitutes a natural monopoly and that, accordingly, conduct undertaken by the defendant in furtherance of any attempt to monopolize such market is not actionable under Section 2 of the Sherman Act. CEI argues more specifically in this regard that, in view of the existence of the alleged natural monopoly market, the defendant was under no affirmative obligation to deal with its direct competitor, the

City, and could therefore resist, with impunity, any and all of the plaintiff's efforts to secure from CEI a permanent interconnection and the wheeling of PASNY power.

Defendant predicates its natural monopoly contention upon two principal sources, those being (i) the testimony of the plaintiff's experts, see Transcript at pp. 3904–3907, 3938, 4322–4325; and (ii) the general recognition, reflected in both the case authorities and the pertinent scholarly literature, that the distribution of electric power at retail constitutes a natural monopoly.[3] In contesting defendant's claim, however, the City argues with considerable force that while the foregoing sources lend support to the assertion that the retail distribution of electricity generally represents a natural monopoly market, these particular sources fail, for the most part, to address the actual conditions prevailing in the specific geographic market here in question. The City notes in this regard that neither of the plaintiff's expert witnesses expressly opined, or were asked to so opine, that the retail distribution of electric power in the Cleveland area itself constitutes a natural monopoly market. The City argues further that defendant's natural monopoly contention is not entirely consistent with historic fact, as the evidence discloses, without contradiction, that each of the instant utility systems has in fact managed to survive the rigours of competition for a duration which now exceeds sixty (60) years.

The Court, having reviewed the record, cannot agree that the evidence adduced to date, even if buttressed by the aforementioned general recognition which defendant suggests should be judicially noticed, "points so strongly in favor" of CEI's natural monopoly claim that "reasonable minds could not come to a different conclusion". *Morelock, supra.* While the Court acknowledges that a contrary result might arguably obtain in the event it was incumbent upon the plaintiff to disprove the existence of a natural monopoly, it would appear that the City bears no such burden. The District of

Columbia Circuit Court of Appeals' decision in *Hecht v. Pro-Football, Inc. supra,* is instructive:

> The trial judge further instructed the jury, however, that [plaintiff—] Hecht bore the burden of proving that the [defendant—] Redskins did *not* have a natural monopoly...
>
> This part of the instruction, we think, was incorrect. It is the clear thrust of *Alcoa [United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945)] that, once plaintiff has proven the defendant's maintenance of its monopoly power through conscious business practices, a rebuttable presumption is established that defendant has the requisite intent to monopolize. The defendant can defeat this presumption by showing that it had monopoly, as some have greatness, "thrust upon it"—that its power derives from "superior skill, foresight and industry" or (as is particularly relevant here) from the advantages of natural monopoly conditions. Both the Supreme Court, and the lower courts, have echoed this position. We are not called upon in this case to elaborate the various circumstances under which the burden of proof in § 2 cases might shift to defendant; we hold merely that when, as here, a defendant seeks to avoid a charge of monopolization by asserting that it has a natural monopoly owing to the market's inability to support two competitors, the defendant, and not the plaintiff, bears the burden of proof on that score.

*Hecht, supra* at 991 (footnotes omitted).

In view of the fact that comparatively little evidence has been adduced which demonstrates the actual market conditions prevailing in the particular geographic market here in issue, and in light of the fact that the evidence, viewed most favorably to the plaintiff, permits the inference that the instant market is reasonably capable of supporting more than one competitor, the Court is constrained to conclude that reasonable minds could indeed differ

---

3. Defendant submits that this recognition is of such a nature that judicial notice thereof may properly be taken pursuant to Rule 201, Fed. R.Ev.

on the question of whether the defendant has sustained its burden of establishing that the retail distribution of electric power in the Cleveland area constitutes a natural monopoly market. Having made this determination, the Court cannot currently accede to the defendant's request that the Court hold, as a matter of law, that CEI was under no obligation to deal with the plaintiff and was therefore justified in resisting interconnection and the wheeling of PAS-NY power. The Court observes in this respect that while it is well-settled that "as a general rule, there exists no duty to deal, so long as the determination is made unilaterally", *Byars, supra* at 854, it is equally well-established that where a business enterprise "possesses monopoly power, added obligations are imposed on the defendant which would not attach in the ordinary refusal to deal context". *Id.* at 855. Accordingly, a business possessing monopoly power ordinarily cannot wilfully refuse to deal with a competitor if the refusal is designed and calculated to foreclose competition or to remove or exclude a competitor by unfair, unreasonable or predatory practices or conduct. *See Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Lorain Journal v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Otter Tail Power Co. v. United States, supra.* In ascertaining whether a unilateral refusal to deal is sufficiently anticompetitive in nature to comprise unfair or predatory conduct, it would appear that the "overall impact of the monopolist's practices" must be assessed and a "thorough analysis" of the prevailing "fact situation" undertaken. *Byars, supra* at 860.

The Court would discern from the foregoing principles that, at this juncture of the proceedings, the issue of whether the defendant was justified in resisting the plaintiff's efforts to secure an interconnection and the wheeling of PASNY power is essentially a question for the jury's resolution, requiring the panel to take into account numerous factors, including, as a threshold matter, the question of whether CEI does in fact possess monopoly power in the relevant geographic market. The Court accordingly declines as improvident the defendant's invitation to hold and instruct the jury that CEI was under absolutely no compulsion to deal with the plaintiff in connection with the aforesaid endeavors.

■ The Court does find meritorious, however, the defendant's Rule 50(a) motion insofar as it seeks a determination that the City has failed to adduce sufficient proof in support of its contention that it has been unlawfully excluded from membership in the Central Area Power Coordinating Group, (CAPCO). The Court would observe initially that the plaintiff has utterly failed to sustain its burden of demonstrating that the exclusion from CAPCO was occasioned by the instant defendant's unilateral conduct, as required under the terms of this Court's Memorandum and Order of October 1, 1980, 538 F.Supp. 1287. The Court notes in this regard that while the evidence has disclosed that CEI did in fact oppose plaintiff's proposed membership in CAPCO as of August, 1973, and that this opposition persisted thereafter, the evidence further establishes, in uncontroverted fashion, that several other CAPCO members, including the Ohio Edison Company, its operating subsidiary Pennsylvania Power Company, and the Duquesne Light Company, similarly opposed the City's request for CAPCO membership. PTX 32, 764. The December 10, 1973 correspondence of John Arthur, Chairman of the Board and Chief Executive Officer of Duquesne Light, is particularly revealing:

> You have asked to join the Capco Power Pool and requested a response to your request. We assume that you will understand that Duquesne Light Company can answer only for itself and not for any other Capco company.
>
> We do not see an advantage from your entrance into the Capco group and we see serious disadvantages. Capco is a voluntary association in which each member reaches independent decision, and in which any member can frustrate joint action. We believe that Capco would not be operable as a practical matter with the addition of an electric operating entity of

your small size. We feel that your electric generating, transmission and distribution characteristics are so dissimilar from ours and the other Capco companies that you would not be a workable addition to Capco.

In your letter you propose to become an owner of a small percentage share of certain power stations which are in various stages of planning and construction. In addition to the question whether it is legally proper for you to become such an owner, we think it would be very difficult if not impossible to replan and renegotiate all the complicated understandings and arrangements for individual power station construction which presently exist.

PTX 764.

There has been no evidence adduced which demonstrates, or which permits the reasonable inference that, the opposition of either Ohio Edison or Duquesne Light was in any way coerced, induced, or otherwise prompted by the instant defendant's conduct. The evidence thus demonstrates, without contradiction, that the plaintiff's exclusion from membership in CAPCO ultimately ensued as a consequence of opposition thereto which was shared by several CAPCO participants, and which was not simply the product of CEI's unilateral conduct. Under the instant circumstances, the Court is of the opinion that insufficient proof of CEI's unilateral conduct has been presented to warrant jury consideration of this particular contention.

The City has similarly failed, in connection with its CAPCO claim, to adduce sufficient proof of either its legal or financial ability to participate in the organization. It is clear from the record and the applicable authorities that while CAPCO contemplated at the time of the City's membership proposals joint ownership of various generating facilities, *see* DTX 1, Transcript at pp. 3398, 3408–3408, the City was prohibited from participating in such a manner by Section 6, Article XVIII of the Ohio Constitution, which, as authoritatively construed by the Ohio Supreme Court, proscribes arrangements whereby a municipality owns "part of property which is owned in part by another, so that the parts owned by both, when taken together, constitute but one property." *State ex rel. Wilson v. Hance*, 169 Ohio St. 457, 159 N.E.2d 741, Syllabus 3 at 742 (1959), *approving Alter v. City of Cincinnati*, 56 Ohio St. 47, 46 N.E. 69. Moreover, and without belaboring the point, the City has made no showing that it possessed the financial wherewithal to advance the substantial sums of capital necessary to fund entry into the CAPCO organization.

While the Court has, for the foregoing reasons, concluded that the defendant cannot be held liable for the plaintiff's failure to attain CAPCO membership, the Court, viewing the evidence most favorably to the plaintiff, is of the opinion that sufficient proof has been adduced to warrant jury consideration of the plaintiff's broader assertion that CEI has, apart from the denial of actual CAPCO membership, unlawfully and unilaterally denied the City access to the benefits of coordinated operations and development generally. Defendant's motion, insofar as it seeks a directed verdict on this broader contention, as distinct from the question of CAPCO membership *per se*, is without merit and therefore denied.

The Court would observe lastly that, having reviewed the evidence heretofore adduced in light of the specific allegations of misconduct advanced in the plaintiff's Second Amended Complaint, it concurs with the defendant's assessment that the following allegations fail for lack of proof and are therefore no longer germane to this case:

1) the City's assertion that CEI has unlawfully refused to wheel or allow the transmission of electric power "from the plaintiff to any other electric utility system", Second Amended Complaint ¶ 35(a);

2) the City's contentions that defendant has prevented the plaintiff from:

(a) "competing for industrial loads," *id.* ¶ 36(3);

(b) "issuing bonds to finance improvements and extentions of its system", *id.* ¶ 36(f); and

(c) "constructing transmission lines to interconnect its system with the electric systems of the Cities of Painesville and Orrville" *id.* ¶ 36(i).

In accordance with the foregoing, the motion of the defendant for a directed verdict pursuant to Rule 50(a) is hereby granted in part, and denied in part, as appears more fully above.

IT IS SO ORDERED.

## SUPPLEMENTAL OPINION

This matter is presently before the Court on a series of motions advanced by both parties pursuant to Rule 50(a), Fed.R.Civ.P., at the close of plaintiff's rebuttal evidence. During the course of proceedings conducted on October 28, 1980, the Court entertained oral arguments thereon. *See* Transcript at pp. 6216–6235.

Defendant, Cleveland Electric Illuminating Company (CEI), has *inter alia* renewed its request for a determination that the relevant geographic market is the thirty-square-mile-area within which plaintiff and defendant actually compete. Plaintiff, City of Cleveland (City) again maintains that the evidence is sufficient to present a jury question as to whether the 1,700-square-mile area comprising CEI's entire service territory constitutes the relevant geographic market for purposes of this case.

The plaintiff does not predicate its relevant market contention on the claim that MELP actually competed or could have competed in the latter area, *see* Transcript at pp. 6224–6226, and indeed the record is utterly devoid of evidence even suggesting the existence of or potential for retail service competition between the parties throughout the entire 1,700-square-mile territory. Rather, plaintiff maintains that the entire CEI service area constitutes the relevant geographic market because (1) MELP's actual competition with defendant within the aforesaid thirty-square-mile-area affects defendant's retail pricing throughout CEI's entire service territory, and (2) defendant "draws upon" its resources developed within that broader area to support and enhance its competitive efforts within the area of actual competition.

For reasons developed more fully below, however, the Court finds plaintiff's arguments legally insufficient to support its claim that the relevant geographic market comprises the entire aforesaid 1,700-square-mile area. As noted in this Court's Memorandum and Order of October 20, 1980:

In ascertaining the scope of the relevant geographic market for Sherman Act purposes, it is incumbent upon the trier of fact to determine "where, within the area of competitive overlap, the effect of the [antitrust violation] on competition will be direct and immediate." *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 1738 [10 L.Ed.2d 915] (1963); *United States v. Grinnell Corp., supra.*

*See City of Cleveland v. The Cleveland Electric Illuminating Co.,* 538 F.Supp. 1306, at 1313 (N.D.Ohio 1980). In other words, the relevant geographic market, for antitrust purposes, comprises that area within which the sellers of a commodity effectively compete, and in which prospective purchasers are effectively offered a choice as among alternative sources of supply. *See e.g. United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Tampa Electric Company v. Nashville Coal Company,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Plaintiff's arguments, however, ignore these established criteria of market definition.

The City's "price-influence" contention focuses not upon the "direct and immediate" effects of defendant's purported anticompetitive conduct, but rather upon indirect and secondary effects on defendant's retail service rates (throughout its service area) resulting from plaintiff's conduct in competing with the defendant in the thirty-square mile area. Plaintiff has failed to demonstrate that the 1,700-square-mile territory was an "area of effective competition" between MELP and CEI, and the fact that actual competition between the parties within the aforesaid thirty-square-mile area might have affected de-

fendant's retail pricing throughout its entire service territory does not compel the conclusion that the latter area constitutes the relevant geographic market for purposes of this suit. Such an attempt to artificially expand the Sherman Act's scope of relevant geographic market was considered and rejected in *West-Texas Utilities Co. v. Texas Electric Service Co.*, 470 F.Supp. 798 (N.D.Tex.1979) wherein Judge Porter disapproved a similar "price influence" contention:

> Some of plaintiffs' witnesses said that two utilities are in competition when one utility takes some action that will affect, in some way, the price charged by the other utility for its electric power. Thus, the defendants alleged refusal to operate electrically interstate has an effect on plaintiffs' prices, as evidenced allegedly from plaintiffs' economic testimony, and therefore plaintiffs are in competition with the defendants ...
>
>     \*     \*     \*     \*     \*     \*
>
> I should point out that if plaintiffs' view of competition is correct, then every Sherman Act case is really a price fixing case. If we accept plaintiffs' view of competition, then every purchaser has an ultimate choice of whether to buy a particular product, and every manufacturer in some way (significant or insignificant) affects the price of every commodity, thus there are no geographic limitations (and probably few product limitations) to the competitive market in an antitrust case.
>
>     \*     \*     \*     \*     \*     \*
>
> The case law also does not support such a broad reading of the term market in a Section 1 case, or for that matter, in a Section 2 case either.
>
>     \*     \*     \*     \*     \*     \*
>
> If I were to accept these definitions, I would, it seems to me, be virtually eliminating the concepts of geographic and product market from consideration in an antitrust case. *Id.* at 820–821.

Accordingly, the Court finds plaintiff's "price influence" argument legally insufficient to establish the 1,700-square-mile area as the relevant geographic market within the parameters of this suit.

       Plaintiff's contention that the relevant geographic market constitutes that area of resources which defendant presumably "draws upon" to support its competition with MELP in the City of Cleveland is equally unsupportable. Such an argument also ignores the time-honored principles noted above that relevant geographic market is determined by reference to the "area of effective competition" or the area in which prospective purchasers are effectively offered a choice among alternative sources of supply, and focuses instead upon the mere size of the defendant's firm, or the territorial limits of its business activities. The Court is aware of no authority, and the plaintiff has cited none, which sanctions a definition of relevant geographic market dependent solely upon the boundaries of the defendant's business territory without reference to "areas of competitive overlap." While this Court has recognized that business activities carried on in one "market" or phase of an industry may affect competition in another, *see City of Cleveland v. The Cleveland Electric Illuminating Co., supra* at 1310 and 1313; *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), such does not compel the conclusion that the relevant geographic market encompasses the entire area wherein a defendant conducts its business. The relevant geographic market within the purview of the Sherman Act remains the area of "competitive overlap" within which the "direct and immediate" effects of the antitrust violations are manifested.

The logical extension of plaintiff's argument would not only lead to absurd results but would serve to "virtually eliminat[e] the concept of geographic ... market from consideration in an antitrust case." *West-Texas Utilities Co., supra* 470 F.Supp. at 821.

For the foregoing reasons, the Court concludes, as a matter of law, that the relevant

geographic market does not constitute the 1,700-square-mile area comprising CEI's entire retail service territory. The Court, however, is fully cognizant that "[t]he boundaries of the geographic area ... must be drawn so as to take into account not only existing but potential competition as well," *City of Cleveland v. The Cleveland Electric Illuminating Co., supra* at 1313, and that "[t]he record reflects at least some evidence of plaintiff's efforts to extend its existing retail sales market beyond the aforementioned thirty-square-mile area," *Id.* at 1314, *see* Transcript at pp. 1134–1146, 2805–2810, and even beyond the boundaries of the City of Cleveland. *See* Transcript at pp. 1139–1141, 2808–2810. Viewing this evidence of potential competition in a light most favorable to the City, the Court concludes that reasonable minds might differ as to the precise parameters of the "area of effective competition" and, accordingly, the issue, as limited hereinabove, will be submitted to the jury for its determination upon proper instructions.

Upon review of the record in its entirety as well as the authorities cited in this Court's Memorandum Opinion of October 20, 1980, the Court concludes that all remaining Rule 50(a) motions advanced or renewed by either party at the close of plaintiff's rebuttal evidence, with the exceptions noted below,[1] are properly denied.

IT IS SO ORDERED.

---

1. The issues concerning (1) the applicability of the pass-on defense, and (2) limitation of damages resulting from CEI's refusal to wheel PAS- NY power are the subject of a separate Memorandum Opinion.