**BOROUGH OF LANSDALE, Appellant,**

v.

**PHILADELPHIA ELECTRIC COMPANY.**

No. 82–1255.

United States Court of Appeals, Third Circuit.

Argued Sept. 29, 1982.

Decided Nov. 8, 1982.

Stephen W. Miller (argued), Samuel R. Marshall, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa. for appellant.

Raymond T. Cullen (argued), R. Stephen Berry, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee.

Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

In this appeal from a judgment entered on a jury verdict in a case brought under § 2 of the Sherman Act,[1] our major task is to decide if the district court erred in not setting aside the jury's finding with respect to the definition of the relevant geographic market. Appellant, the Borough of Lansdale, operates a small retail electric company. Failing to obtain certain services from the Philadelphia Electric Company, Lansdale brought an antitrust action but did not prevail before the jury. Before us on this appeal, it now argues that the geographic market should have been defined as a matter of law. We affirm the judgment of the district court.

### I.

The Borough of Lansdale comprises 2.9 square miles in Montgomery County, Pennsylvania. Although it lies within the service area of the Philadelphia Electric Company, it is also adjacent to an area served by Pennsylvania Power and Light Company. For several years Lansdale has operated its own electric utility company, but since 1972 it has not generated its own power; rather, it purchases electricity wholesale from Philadelphia Electric and resells it to its own customers. Philadel-

---

* Honorable H. Curtis Meanor, of the United States District Court for the District of New Jersey, sitting by designation.

1. Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2.

phia Electric is a vertically-integrated, investor-owned public utility company whose service area comprises 2,255 square miles. Lansdale is one of seventy-three municipalities in Philadelphia Electric's service area that are authorized by statute to operate their own electrical systems, but it is the only municipality that actually does so. Within Philadelphia Electric's service area Lansdale is its only wholesale customer and the only other retail power company. At present Philadelphia Electric is the only utility with transmission lines to Lansdale.

Lansdale has two potential methods of purchasing wholesale power other than obtaining it from Philadelphia Electric: building a high tension line to connect its system with Pennsylvania Power and Light Company; or arranging to have power moved over Philadelphia Electric's lines by a process known as wheeling. Wheeling involves transfer of electricity by direct transmission or displacement from one utility to another over the facilities of an intermediate utility.

From 1972 to 1977 Lansdale bought power from Philadelphia Electric under a fixed-rate contract, although Philadelphia Electric unsuccessfully attempted to raise its wholesale rate when confronted with higher fossil fuel costs. In 1975, with the end of its contract term approaching, Lansdale began to investigate the possibility of purchasing power from other suppliers, *e.g.*, Pennsylvania Power and Light Company, Niagara Mohawk Power Corporation, and the Power Authority of the State of New York. Upon receiving commitments from these suppliers, Lansdale asked Philadelphia Electric whether it could wheel power from them over Philadelphia Electric's lines. The parties dispute the nature of Philadelphia Electric's response: Lansdale construes it as a flat refusal to wheel; on its part Philadelphia Electric states that it said it was willing to wheel "unit power," loosely defined as electric power from a generating facility in which Lansdale was part owner.[2]

Philadelphia Electric also made plans in contemplation of the end of its Lansdale contract. It filed with the Federal Energy Regulatory Commission two successive wholesale rate increase requests which Lansdale opposed as discriminatory, anticompetitive, and not cost justified. In particular, Lansdale opposed Philadelphia Electric's proposed Auxiliary Service Provision to compensate Philadelphia Electric for back-up service in the event that Lansdale obtained an alternative power source. Responding to Lansdale's argument that back-up service would not be needed, an administrative law judge considering Philadelphia Electric's first filing found the Auxiliary Service Provision proposal "not just and reasonable," app. at 765a, but otherwise approved the rate increase. Lansdale did not appeal this decision. Philadelphia Electric then deleted a similar Auxiliary Service Provision from its second filing. As to the remainder of the second request, however, an administrative law judge found a *de minimis* disparity between Philadelphia Electric's wholesale and retail rates, but nevertheless approved Philadelphia Electric's rate increase request in relevant part. App. at 821a–23a.

Lansdale brought this action for damages and injunctive relief in July 1978 contending that Philadelphia Electric's new wholesale rates, combined with its refusal to wheel and its attempt to charge Lansdale for unneeded back-up service, constituted illegal monopolization in violation of § 2 of the Sherman Act. Lansdale presented essentially two theories: that Philadelphia Electric, in refusing to wheel and in filing the Auxiliary Service Provision proposals, used its strategic dominance in the wholesale market to foreclose competition from alternate wholesale sources and thus to injure Lansdale; and that because Philadelphia Electric's increased wholesale prices were greater than some of Philadelphia Electric's retail prices, Lansdale's ability to

---

**2.** Defendant's expert, Dr. John Landon, testified that defendant had "taken the position that if Lansdale goes into the electric business and . . . builds or purchases interest in its own generation, . . . the Philadelphia Electric Company will wheel for the Borough." App. at 571a.

compete with Philadelphia Electric for retail customers was impaired by a "price squeeze." Also important to its monopoly claims was its argument that, because of construction costs and various environmental hurdles, it would not be feasible to build its own high tension line connecting it to other electricity suppliers.

The parties stipulated that the relevant product markets were "firm electric power"[3] for sale at wholesale, and electric power for sale at retail. Thus, their presentations, emphasizing expert testimony, concentrated on definition of relevant geographic market and possession of monopoly power. Lansdale's expert defined the relevant geographic markets for both retail and wholesale power as identical to Philadelphia Electric's service area. Philadelphia Electric's expert defined the wholesale market broadly to include the service areas of nearby wholesale sources; he provided a more complex definition of the geographic market for retail power, tending to focus on Lansdale as Philadelphia Electric's major source of retail competition. The trial judge instructed the jury:

In determining the relevant [geographic] market, you should consider the area in which the seller operates and the area to which purchasers can practically turn for each product under consideration. In determining the area of effective competition, you may include areas of potential competition if you find that the plaintiff has proven the existence of potential competition by a preponderance of the evidence. For you to decide that potential competition exists, the evidence must show something more than the existence of an entity with the legal authority to sell either retail or wholesale electric power. However, you need not limit your consideration to competition that appears to be immediate or imminent. In determining whether potential competition exists, you may consider existence of regulation, the nature of the product itself, and the means required to deliver the product. You may consider how these affect the likelihood of a new seller entering the market. You should also consider whether any entity has shown an interest or desire in competing with [Philadelphia Electric] in areas where [Philadelphia Electric] services either wholesale or retail customers. You will recall that the pertinent consideration is the area to which a buyer can rationally turn for an alternate supplier of power.

App. at 687a–88a. The jury returned its findings in the form of answers to the following special interrogatories:

Does Philadelphia Electric possess monopoly power within the relevant *retail* market as you find it?

Does Philadelphia Electric possess monopoly power within the relevant *wholesale* market as you find it?

App. at 1058a. The jury answered both questions in the negative and therefore was not required to determine if Philadelphia Electric had wilfully acquired or maintained monopoly power[4]. Raising essentially the same contentions it presents on this appeal, Lansdale moved for judgment n.o.v. and for new trial. The district court denied Lansdale's motions.

Although Lansdale contends that the determination of the relevant geographic market in a § 2 case involving an electric utility is a matter of law, it argues in the alternative that the evidence presented to the jury supported only one definition. It contends further that the evidence compelled a finding that Philadelphia Electric possesses monopoly power, that the court erred in receiving certain evidence from Philadelphia Electric's expert witness, that the court misconceived Lansdale's burden of proof on competition, and that judgment

---

**3.** "Firm electric power" is "power which the consumer is assured will be available on demand." Hjelmfelt, *Exclusive Service Territories, Power Pooling and Electric Utility Regulations*, 38 Fed.B.J. 21, 27 (1979).

**4.** We note that, because of the form of the interrogatories, we cannot determine how the jury defined the relevant geographic markets. Indeed, the jurors may have employed precisely the definition that Lansdale urged, but found Philadelphia Electric to lack monopoly power.

should be entered on Lansdale's behalf for Philadelphia Electric's refusal to wheel power.

## II.

The offense of monopolizing under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant product and geographic market and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966); *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1062 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Monopoly power may be defined as the power to control prices and exclude competition with respect to a particular product and within a particular geographic market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Because both geographic market and monopoly power are concepts whose definition depends in part on the sources and extent of competition, it is difficult to draw a bright line between the steps of identifying the relevant geographic market and assessing the presence of monopoly power. Lansdale contends that with respect to an electric utility company, however, the analysis is simplified because the geographic market may be defined as a matter of law to be the utility's service area. We disagree.

## A.

Central to Lansdale's contention that the geographic market should have been determined as a matter of law is its reliance on a single sentence from *Otter Tail Power Co. v. United States:* "The aggregate of towns in Otter Tail's service area is the geographic market in which Otter Tail competes for the right to serve the towns at retail." 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973). From this single sentence Lansdale concludes that the relevant geographic market is identical to the service area.

It has been recognized that in § 2 cases identification of the relevant geographic market is a matter of analyzing competition. "The geographic market encompasses the area in which the defendant effectively competes with other ... businesses for the distribution of the relevant product," *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 531 F.2d 910, 918 (8th Cir.1976); it is "defined in terms of where buyers can turn for alternative sources of supply," *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1218 (9th Cir. 1977).[5] The definition of the relevant geographic market, therefore, is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration. *See generally* II E. Kintner, Federal Antitrust Law § 12.4 (1980). We are not persuaded that the electric utility industry has distinguishing characteristics that would allow us to short-circuit the factfinder's function. Service areas rarely overlap and are defined by the placement of transmission and distribution lines; nevertheless, an electric utility can experience competition from other, geographically separate utility companies, *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 930 (2d Cir.1981), which it must consider in making its pricing decisions. *See generally Borough of Ellwood City v. Pennsylvania Power Co.,* 462 F.Supp. 1343 (W.D. Pa.1979); Pace, *Relevant Markets and the Nature of Competition in the Electric Utility Industry,* 16 Antitrust Bull. 725 (1971). Indeed, Lansdale has not cited, nor has our independent research disclosed, any decision in which an electric utility's geographic market was defined without at least brief consideration of the existing competitive forces. *See, e.g., City of Cleveland v.*

---

**5.** *Cf. Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961) ("[In a case brought under § 3 of the Clayton Act] the area of effective competi-tion ... must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies.").

*Cleveland Electric Illuminating Co.,* 538 F.Supp. 1306 (N.D.Ohio 1980); *Town of Massena v. Niagara Mohawk Power Corp.,* 1980–2 Trade Cas. (CCH) ¶ 63,526 (N.D.N.Y. 1980); *City of Mishawaka v. American Electric Power Co.,* 465 F.Supp. 1320 (N.D. Ind.1979), *aff'd in part,* 616 F.2d 976 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

By dipping into the *Otter Tail* opinion and picking out a single sentence, Lansdale is guilty of the common fallacy of vicious abstraction—the removal of a statement from its context, thereby changing its intended meaning. *See* W. Sahakian & M. Sahakian, Ideas of the Great Philosophers 15–16 (1966). What was before the Supreme Court in *Otter Tail* is not the issue presently before us: whether determination of the relevant geographic market was for the court or for the jury. Although in *Otter Tail* the relevant geographic market coincided with the aggregate of the towns in the defendant's service area, there is in that opinion no indication that its definition was achieved as a matter of law. Lansdale purports to represent as a decision of the Supreme Court only one line in its *ratio decidendi.* Although the Supreme Court's opinion reduces the definition of geographic market to one sentence, it is clear that it did so only upon determining that the district court had analyzed the extent and sources of competition to the defendant. *See* 410 U.S. at 369 n. 1, 93 S.Ct. at 1026 n. 1. Thus, we reject Lansdale's contention that the geographic market issue should be resolved as a matter of law.

### B.

We now turn to Lansdale's alternate contention that the evidence compelled the jury to adopt Lansdale's definition of the relevant geographic market as the entire Philadelphia Electric service area. In this inquiry, our review is limited to determining whether there was presented to the jury evidence sufficient to support a finding that the relevant geographic market was any-

thing other than Lansdale's proffered description.

█ It also appears that our inquiry need focus only on the definition of the relevant geographic market for wholesale power. Having reviewed the pleadings, we conclude that the question of monopoly power within the retail product market is irrelevant: whether Philadelphia Electric refused to wheel power and attempted to impose an unneeded Auxiliary Service Provision goes to its ability to monopolize the wholesale electric power market; further, under the "price squeeze" theory the allegation is that Philadelphia Electric attempted to impair Lansdale's ability to compete by raising wholesale rates—not that it lowered retail rates. Although we do not question the regularity of the court's instructions and the jury's findings with respect to the retail market, we hold that the possession of monopoly power in the relevant geographic market for retail power is not really in issue.[6]

█ With respect to the wholesale market, Lansdale presented expert testimony that the relevant geographic market was identical to the Philadelphia Electric service area. Its expert, Mr. Stephen Merchant, explained that his conclusion was based on the impracticality of wholesale customers building their own transmission lines to nearby wholesale suppliers. In his view, because Philadelphia Electric's transmission lines are the only means of obtaining wholesale power, the location of those lines defines the relevant geographic market.

Philadelphia Electric also presented expert testimony; however, its expert, Dr. John Landon, defined the relevant geographic market for wholesale power more broadly to include not only Philadelphia Electric's service area, but also those of seven nearby utility companies whose rates Dr. Landon concluded would be more favorable than Philadelphia Electric's. Electricity from these alternative sources could be brought into the municipalities of Philadel-

---

**6.** Accordingly, we do not reach Lansdale's contention that the court placed upon it an errone-

ous burden of proof on competition in the retail market.

phia Electric's service area by means of municipally built transmission lines, or, in the case of unit power, by wheeling. Although Dr. Landon did not speak to the practicality of each municipality building its own transmission line, he did present a year-by-year comparison showing that, for the Borough of Lansdale, building its own transmission line to connect it to Pennsylvania Power and Light would be cheaper than wheeling and that the line quickly would have paid for itself. Philadelphia Electric also presented testimony of an engineering expert who stated that this 2.5 mile line could have been constructed in as little as 14 to 16 months.

Upon reviewing the conflicting expert testimony, we conclude that there was sufficient evidence from which the jury could find that for its wholesale customer, Philadelphia Electric was not the only supply. Accordingly, we hold that with respect to relevant geographic market the district court's refusal to grant Lansdale's motion for judgment n.o.v. was not error.

The battle of experts was waged in the trial court before the jury. The jury resolved the factual dispute. What Lansdale lost, fairly and squarely, at the hands of a jury cannot be retrieved by converting a factual controversy into an issue of law.

### III.

We now consider Lansdale's second argument, that Philadelphia Electric has nearly 100% control of the transmission lines in its service area and that, accordingly, no reasonable jury could have found a lack of monopoly power.

■ Monopoly power is "the power to control prices or exclude competition" within the relevant geographic and product markets. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); *Smith-Kline,* 575 F.2d at 1065. The interplay between relevant market and monopoly power is generally crucial to a § 2 case, because if the market is defined broadly, a defendant is less likely to be found to possess "the power to control prices or exclude competition" within it.

■ Our review on this question is limited to inquiring whether the jury could reasonably conclude that Philadelphia Electric did not possess monopoly power. Our task is complicated by the form of the interrogatory: we cannot determine whether the jury joined Lansdale in defining the relevant geographic market as the Philadelphia Electric service area, or whether it accepted Philadelphia Electric's broader definition. Nevertheless, we will assume for the moment that the jurors chose the broader definition.

Supporting his testimony with analysis of wholesale transactions, Dr. Landon testified that within this large area, Philadelphia Electric had only a 6.9% share of the wholesale market and, therefore, no monopoly power. Because Lansdale insisted on its geographic market definition, this testimony was not directly rebutted. As we have outlined above, the alternative wholesale supplies that Philadelphia Electric described are not illusory, given the expert testimony that a municipally constructed transmission line would be feasible. Accordingly we cannot say that a jury finding that Philadelphia Electric lacked monopoly power in the geographic market as Dr. Landon defined it would be unsupported by evidence.

If we repeat the above analysis using Lansdale's proposed definition of geographic market, we come to a similar result. Its argument that Philadelphia Electric had monopoly power within that area was based on Philadelphia Electric's near-total control of the transmission lines and the practical inability of municipalities in the center of the service area to build their own transmission lines to other wholesalers. Mr. Merchant presented no data in support of his conclusion, however, in contrast to Dr. Landon who provided a detailed basis for his opinion that at least with regard to Lansdale, the only wholesale customer in the area, a municipally constructed transmission line would not be economically unrealistic. Therefore, a jury could reasonably conclude that Philadelphia Electric

**314**

lacked the physical power to exclude wholesale competitors from its service area. We also note testimony that the wholesale rates of alternative suppliers were lower than Philadelphia Electric's—evidence tending to negate economic power to exclude. In sum, even were we to conclude that the jury accepted Lansdale's definition of geographic market, we could not hold its finding of lack of monopoly power to be unsupported.

### IV.

Having not disturbed the jury's finding that there was no evidence of monopoly power by Philadelphia Electric in the relevant market, it is unnecessary to consider Lansdale's contention that Philadelphia Electric's refusal to wheel power is monopolistic conduct as a matter of law.

### V.

◼ Finally, Lansdale argues that certain testimony and exhibits presented by Philadelphia Electric's expert, Dr. John Landon, unfairly portrayed Lansdale in an unfavorable light, viz, that Lansdale had made excess profits while the earnings of Philadelphia Electric and other utilities were considerably lower. On this question our review is for abuse of discretion. Lansdale contends that the information was irrelevant and unfairly prejudicial because it suggested that Lansdale had acted improperly. Philadelphia Electric responds, and we agree, that the testimony and exhibits regarding Lansdale's profits were relevant to damages and also to the issue of Lansdale's ability to build a high tension line to connect it with Pennsylvania Power & Light. The court did not abuse its discretion in accepting this evidence.

### VI.

We have carefully considered all the contentions presented by the appellant. The judgment of the district court will be affirmed in all respects.