HATCHETT, Circuit Judge:
In this Sherman Act antitrust case, we apply the teachings of Helicopter Support Systems v. Hughes Helicopter, 818 F.2d 1530 (11th Cir.1987) to affirm the district court’s ruling that no violation of the Sherman Act occurred as a result of the proof developed in this case.
FACTS
In October, 1982, Sam Dunnivant, the appellant, opened an automotive parts store (Sammy’s Auto Parts) in Ardmore, Alabama, and continued operation until March, 1985. Three other automotive re *1578 tail businesses were also located in Ard-more: Ardmore Parts, Inc. (Spence), Bi-State Auto Parts, and the Otasco Store. Ardmore has a population of less than 2,000.
S & S Auto Parts (S & S), Auto Electric Service, Inc. (Auto Electric), Don’s Foreign Auto Electric, Inc. (Don’s Foreign Auto), and Mid-State Automotive Distributors, Inc. (Mid-State) are suppliers of automotive parts in the Ardmore area. Dunnivant contacted these suppliers in an effort to stock automotive parts. Initially, Dunni-vant could not find a supplier who delivered in Ardmore to sell him automotive parts. As a result, Dunnivant purchased parts from suppliers in Huntsville, Alabama, and transported the parts to his store in Ardmore.
Dunnivant also sold oxygen and acetylene which he purchased from Thompson Welding and Supply in Gurley, Alabama. Alabama Oxygen provided Thompson Welding with oxygen supplies. Because Dunnivant’s customers brought their empty gas cylinders to Ardmore Parts (Spence), Paul Spence complained to Alabama Oxygen Company. Spence was accountable to Alabama Oxygen for cylinders used in retail sales and sought to avoid liability for cylinders — valued at $200 — purchased from Dunnivant. Spence advised Alabama Oxygen that he would no longer purchase its cylinders because of its business with Dun-nivant. To appease Spence, Alabama Oxygen advised Thompson Welding and Supply that it could no longer sell to Dunnivant.[1] Dunnivant then attempted to purchase oxygen from Harris Welding Supply Company. Harris Welding decided against conducting business with Dunnivant because it was also in the retail market; the oxygen market averages only $300 a month; and Spence had promised Harris Welding all of his business. As a result, Dunnivant discontinued oxygen sales.
In March, 1984, Auto Electric, a supplier to the three retail competitors, began selling automotive parts to Dunnivant, but Dunnivant was still required to supplement his inventory through purchases from Huntsville, Alabama. On April 3, 1984, Paul Spence returned parts and accessories to Auto Electric for credit asserting that he could no longer do business with Auto Electric because of its business relationship with Dunnivant. Spence’s purchases from Auto Electric during the three months pri- or to April, 1984 averaged over $1000 per month. Notwithstanding Spence’s actions, Auto Electric remained Dunnivant’s primary supplier for thirteen months after the loss of the Spence account. During this period, Dunnivant never stocked a full line of inventory and purchased goods only as needed, averaging $403 per month in merchandise. Because of Dunnivant’s refusal to stock inventory, Auto Electric terminated business relations with Dunnivant and reestablished a business relationship with Spence. Again, Dunnivant attempted to contact suppliers who delivered automotive parts in Ardmore. The suppliers either advised Dunnivant of existing agreements with retailers in Ardmore or determined that Ardmore’s small market made a business relationship unprofitable. Because it was economically unfeasible for Dunnivant to continue to transport parts from Huntsville, and because suppliers refused to sell parts to Dunnivant, he went out of business.
PROCEDURAL HISTORY
Dunnivant filed this lawsuit alleging violations of sections 1 and 2 of the Sherman Antitrust Act (see 15 U.S.C. §§ 1 and 2) and tort claims against his competitors for interference with business relations. All ap-pellees except Mid-State filed motions to dismiss, and Auto Electric and S & S filed motions for summary judgment. The district court entered summary judgment in favor of all appellees except Mid-State. The district court held that Dunnivant “failed to come forward with specific facts showing that there is a genuine issue for trial ... and that [Dunnivant] has failed to present evidence ... to exclude the possibility that the alleged conspirators wqre acting independently.” Dunnivant failed to *1579 take a default judgment against Mid-State, and the district court dismissed the complaint for lack of prosecution. Dunnivant filed this appeal.
The issues are: (1) whether the district court applied, an improper standard of review in granting summary judgment; (2) whether the evidence shows a concerted refusal to deal; and (3) whether the retailers tortiously interfered with Dunnivant’s business relations.
Section 1 of the Sherman Act provides that “[ejvery contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is declared to be illegal.” 15 U.S.C. § 1.
STANDARD OF REVIEW
In Helicopter Support Systems v. Hughes Helicopter, 818 F.2d 1530 (11th Cir.1987), this court held that in order to meet a properly supported motion for summary judgment, a plaintiff seeking damages for Sherman Act section 1 violations must present evidence that tends to exclude the possibility that the alleged conspirators were acting independently. Helicopter, 818 F.2d at 1533-34 (citing Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775, reh’g denied, 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984)); see also Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority, 801 F.2d 1286, 1291 (11th Cir.1986) (where this court in a nonprice fixing case applied the Monsanto standard requiring plaintiff to present evidence excluding the possibility of independent action). “The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Hillsborough, 801 F.2d at 1291 (citing Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Mere complaints of illegal conspiracy that are equally consistent with permissible competition, without more, do not support even an inference of conspiracy. Monsanto, 465 U.S. at 764, 104 S.Ct. at 1470; Helicopter, 818 F.2d at 1533. There must be “direct or circumstantial evidence that reasonably tends to prove that the [parties] ‘had a conscious commitment to a common scheme designed to achieve an unlawful objective.’ ” Monsanto, 465 U.S. at 764, 104 S.Ct. at 1471 (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3rd Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)).[2]
Dunnivant argues that the district court impermissibly shifted the burden of proof to him, the nonmoving party, requiring evidence of the alleged conspiracy. The Supreme Court has long settled burden of proof issues in antitrust actions. In First National Bank v. Cities Service Co., 391 U.S. 253, 289-90, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968), the plaintiff brought an action against defendants for conspiracy to boycott plaintiffs sale of Iranian oil in violation of federal antitrust laws. The Supreme Court affirmed the district court’s grant of summary judgment holding that the plaintiff has the burden of producing evidence which creates a material issue of fact for trial. Rule 56(e) of the Federal Rules of Civil Procedure states that “an adverse party may not rest upon the mere allegations or denials of the ... pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial.” As in Cities Service Co., the district court in this case, on the record before it, correctly placed the burden of producing evidence which creates a triable issue upon the non-moving party. The Supreme Court in Mat-sushita noted:
When the moving party has carried its burden ... its opponent must do more than simply show that there is metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with ‘specific facts showing that there is a genuine issue for trial.’ ... *1580 [And], [w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no ‘genuine issue for trial’ [Footnote omitted] [citations omitted].
Matsushita, 475 U.S. at 586-87, 106 S.Ct. at 1356-57; cf. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[3] Further, the district court correctly required Dunnivant to present evidence to exclude the possibility that the alleged conspirators acted independently. See Monsanto, 465 U.S. at 764, 104 S.Ct. at 1470. Antitrust law limits the range of permissible inferences from ambiguous evidence in a section 1 case. Indeed, conduct as consistent with illegal conspiracy as with permissible competition does not support an inference of antitrust conspiracy. See Helicopter, 818 F.2d at 1533.
I. Application of Standard
To facilitate a proper understanding of Dunnivant’s antitrust claims, we must analyze the business relationships between the various parties as to both vertical and horizontal behavior. The first class of appel-lees consists of suppliers of automotive parts or bottled oxygen. The second class of appellees consists of Dunnivant’s retail competitors, Ardmore Parts (Spence) and Bi-State Auto Parts.
A. Suppliers
1. Auto Electric
In March, 1984, Auto Electric began selling automotive parts to Dunnivant and was the only supplier that delivered parts to Dunnivant in Ardmore. Dunnivant was still required to supplement his inventory through purchases from Huntsville. Spence returned parts to Auto Electric advising it that he could no longer do business with Auto Electric because of its business with Dunnivant. Auto Electric subsequently terminated business relations with Dunnivant and reestablished a business relationship with Spence. In support of his conspiratorial claim, Dunnivant proffered the testimony of William Posey, a former employee of Auto Electric, who testified that the only reason Auto Electric terminated business relations with Dunnivant was due to pressure from Paul Spence.
The district court correctly found that Dunnivant failed to produce specific facts to exclude the possibility that Auto Electric acted independently. Posey’s affidavit is consistent with Auto Electric’s position of discontinuing sales to Dunnivant. The record is undisputed that Auto Electric remained Dunnivant’s primary supplier for thirteen months after the loss of the Spence account. Auto Electric had independent business reasons to terminate its business relationship with Dunnivant: Dunnivant never stocked a full line of inventory, purchased goods only as needed, and averaged $403 per month in merchandise. Spence’s purchases from Auto Electric during the three months prior to termination averaged $1,000 per month.
Dunnivant’s assertion that Spence acted with collusive intent is not sufficient. Dun-nivant has failed to produce evidence which tends to exclude the possibility of independent action on behalf of Auto Electric. See Helicopter, 818 F.2d at 1533-34. Dunni-vant must produce evidence which establishes a genuine issue as to whether there was “a conscious commitment to a common scheme designed to achieve an unlawful objective.” Monsanto, 465 U.S. at 764, 104 S.Ct. at 1471 (quoting Sweeney, 637 F.2d at 111). Given Dunnivant’s erratic purchases and refusal to stock inventory, Auto Electric had independent business reasons to terminate its relationship with Dunnivant and reestablish a business relationship with Spence. Auto Electric did not contact Spence about resuming their business relationship until after it discontinued selling merchandise to Dunnivant. In Construction Aggregate Transport, Inc., v. Florida Rock Industries, Inc., 710 F.2d 752 (11th Cir.1983), this court held:
It is well established that a merchant, whether he be a manufacturer, distributor, wholesaler, or retailer, may choose *1581 with whom he will do business and with whom he will not do business; such action generally does not violate the antitrust laws. Thus, the manufacturer can deal or not deal with customers ‘for reasons sufficient to itself.’ ... Implicit in the freedom to deal exclusively with one merchant, of course, is the freedom to refuse to deal with a competitor of that merchant. [Citations omitted.]
Florida Rock Industries, Inc., 710 F.2d at 772; see also Monsanto, 465 U.S. at 752, 104 S.Ct. at 1464; United States v. Colgate and Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Again, “conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.” Matsushita, 475 U.S. at 588, 106 S.Ct. at 1357. Dunnivant has failed to meet the Monsanto standard, and the district court correctly granted summary judgment in favor of Auto Electric.
2. S & S Auto Parts, Parts Incorporated, and Don’s Foreign Auto
Each of the above-named appellee suppliers had an existing relationship with either Spence or Bi-State prior to this action. S & S Parts (PDW) is a “CarQuest” distributor of automotive parts.[4] Paul Spence is the only “CarQuest” automotive parts dealer in Ardmore, Alabama and PDW does business exclusively with Spence. Although the franchise agreement between PDW and Spence does not require that PDW sell only to Spence, PDW’s policy in small towns is to sell only to its designated dealers. PDW asserts that this policy is in its best economic interest because it prevents multiple deliveries, small transactions, and credit risks.
Parts Incorporated (PI) is a wholesale automotive parts supplier. PI supplies automotive parts to Bi-State pursuant to an associate agreement which provides an incentive program for retailers and does not restrict PI from selling parts to others. Harvey Miller, PI s general manager, met with Dunnivant on two occasions expressing apprehension as to whether Dunni-vant’s account would be profitable given the overall volume of business in the area. Miller also expressed a desire to be loyal to his customer, Bi-State.
Don’s Foreign Electric, Inc. sells foreign car parts to retailers. Donald Sanders, the owner, stated in his affidavit that Dunnivant’s representative contacted him in regard to conducting future business. Although Sanders initially gave his approval concerning the new business, he thereafter rejected a business relationship because of Dunnivant’s interest in an adjacent garage business. Sanders has a policy against selling to anyone in the garage business because such a person or entity would be in direct competition with Sanders’s other customers. Sanders also based his decision not to sell to Dunnivant on practical business considerations.[5]
Dunnivant argues that Spence and Bi-State conspired with the above-named suppliers to boycott his operation in violation of antitrust laws. Upon review of the record, we find no concerted action. Exclusive dealing does not give rise to antitrust liability. “To create a triable issue under Section 1 of the Sherman Act, [one has] to show concerted anticompetitive conduct by a plurality of actors, in ... an unlawful arrangement.” Aquachem Co., Inc. v. Olin Corp., 699 F.2d 516, 520 (11th Cir. 1983) (other citations omitted); see generally Annotation, Refusals to Deal as Violations of the Federal Antitrust Laws, 41 A.L.R.Fed. 175 (1979). Dunnivant presents no evidence that the retailers threatened or coerced the above-named suppliers in a concerted arrangement. “Implicit in the freedom to deal exclusively with one merchant ... is the freedom to refuse to deal with the competitor of that merchant.” Florida *1582 Rock Industries, 710 F.2d at 773. The appellee suppliers had legitimate business freedom to deal exclusively.
Antitrust law makes a distinction between concerted and independent action. Independent action is not proscribed. Distributors of merchandise have a right to select their customers and to refuse the sale of goods to anyone for reasons sufficient to themselves. See Colgate, 250 U.S. at 307, 39 S.Ct. at 468. See also Aviation Specialties, Inc. v. United Technologies Corp., 568 F.2d 1186, 1192 (5th Cir.), reh’g denied, 570 F.2d 1391 (1978).[6] The depositions and affidavits in the record indicate the suppliers made independent business decisions. Thus, the district court correctly granted summary judgment for the suppliers.
3. Harris Welding
Likewise, we find that Dunnivant’s evidence of a conspiracy between Spence and Harris Welding is insufficient. Harris Welding articulated several business reasons for refusing to do business with Dun-nivant. First, Harris Welding felt it was economically imprudent to provide Dunni-vant with oxygen service because it was also in the retail market and the limited retail market in Ardmore averaged only $300 per month. In addition, Harris Welding suffered losses when individuals failed to return cylinders — valued at $200 each— and refused to pay for them. Dunnivant did not assess a rental charge on the cylinders. Moreover, Harris had a long-time business relationship with Spence, and Harris’s decision to deal exclusively with Spence is reasonable. Although Spence may have entertained monopolistic aims in the Ardmore oxygen market, avoidance of summary judgment is achieved only where “the inference of conspiracy is reasonable in light of competing inferences of independent action or collusive action_” Helicopter, 818 F.2d at 1533 (citing Matsushita, 475 U.S. at 588, 106 S.Ct. at 1357). Harris Welding’s refusal to terminate an eleven-year business relationship with Spence suggests nothing illegal; Spence had been a reliable customer. The district court correctly granted summary judgment for Harris Welding.
B. Retailers
No evidence exists to establish an illegal horizontal relationship between the appellee retailers, Spence and Bi-State. The record is devoid of any evidence indicating collusion or concerted action by the two retailers. Although we are aware of Spence’s complaints to suppliers concerning their business relations with Dunnivant, this does not alter our conclusion. It is of no moment that Spence’s independent actions may have caused Dunnivant economic harm. See Garment District, Inc., v. Belk Store Services, Inc., 799 F.2d 905 (4th Cir. 1986), cert. denied, — U.S. —, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988) (where the court in applying the Monsanto standard held that termination may be justified in order to avoid losing a disgruntled customer); see also Golf City, Inc., v. Wilson Sporting Goods, Co., Inc., 555 F.2d 426 (5th Cir.1977). We emphasize that mere complaints are not sufficient proof where the complaints are equally consistent with both an independent and a collusive interpretation. Dunnivant must produce evidence which tends to exclude the possibility of unilateral action. Helicopter, 818 F.2d at 1534. In this case, Dunnivant has failed to meet the standard.
II. Vertical Competition
The Supreme Court has long established that vertical agreements on resale prices are per se illegal. See Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). The Court, however, is careful to narrow this per se rule. See Continental TV, Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 58, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977) (where the Supreme Court refused to extend per se illegality to vertical non- *1583 price restraints). In Business Electronics Corporation v. Sharp Electronic Corp., — U.S. -, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), the Supreme Court held that “vertical nonprice restraints had not been shown to have such a ‘pernicious effect on competition’ ... as to justify per se illegality.” Sharp, 108 S.Ct. at 1519 (quoting Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). “[T]he legality of arguably anticompetitive conduct should be judged primarily by its ‘market impact.’ ” Monsanto, 465 U.S. at 762, 104 S.Ct. at 1470 (citing GTE Sylvania, 433 U.S. at 51, 97 S.Ct. at 2558). If interbrand competition exists, this will afford a safeguard against “any attempt to exploit intrabrand market power.” Sharp, 108 S.Ct. at 1520; cf. Baxter, The Viability of Vertical Restraints Doctrine, 75 Calif.L.Rev. 933, 948-49 (1987). Vertical nonpriee restraints allow suppliers of commerce to earn sufficient profit margins to promote desired services to its customers. Sharp, 108 S.Ct. at 1521.
In this case, the suppliers have a legitimate business interest to ensure that its retailers are competent and willing to promote their products. Indeed, the quality of service has a direct bearing on the goodwill of the suppliers or manufacturers. See Sharp, 108 S.Ct. at 1520; GTE Sylvania, 433 U.S. at 55, 97 S.Ct. at 2560. This necessarily requires initial capital investment for advertising and other functions to promote sales. In a competitive marketplace, it is imperative that merchants be allowed the autonomy to exercise independent judgment in order to facilitate this end. To infer conspiracy from terminations or refusals to deal would, in effect, “deter or penalize perfectly legitimate con-duct_” Sharp, 108 S.Ct. at 1520 (citing Monsanto, 465 U.S. at 763-64, 104 S.Ct. at 1470). Further, we are satisfied that sufficient competition exists in Ardmore to act as a “significant check” on any attempt to exploit the parts market.
III. Conscious Parallelism
Dunnivant also attempts to link the appellee suppliers with the appellee retailers on a theory of conscious parallelism. He argues that each of the individual suppliers was aware of the retailers’ conspiratorial objective, thereby constituting a violation of the Sherman Act. Proof of parallel behavior alone does not establish a pri-ma facie case of a Sherman Act violation. In order to avoid a motion for summary judgment, a plaintiff must come forward with significant probative evidence supporting its theory of conscious parallelism with some “plus” factor which tends to indicate the absence of independent action. In addition, it must be shown that the decisions not to deal were contrary to the defendants’ economic self-interest so as to raise an issue of good faith business judgment. See Aviation Specialties, 568 F.2d at 1192; see generally Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). In this case, because the record clearly indicates economically sound business reasons for the suppliers not to deal with Dunnivant, and because Dunnivant is unable to set forth any significant probative evidence which might suggest to the contrary, his allegation of parallel behavior alone does not establish a prima facie case. See generally First National Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).
IV. State Claim
Dunnivant also asserts a state tort claim against the appellee retailers. Dunnivant argues that under Alabama law the actions of the retailers caused tortious interference with his business relationships. In Griese-Traylor Corp. v. First National Bank of Birmingham, 572 F.2d 1039 (5th Cir.1978), this court held that “in Alabama, a defendant will not be liable where it acted for legitimate economic reasons. Bona fide business competition is a justification for intentional interference with a competitor’s business.” Griese, 572 F.2d at 1045. In Beasley-Bennett Electric Co. v. Gulf Coast Chapter of National Electrical Contractors Assn., 273 Ala. 32, 134 So.2d 427 (1961), the plaintiff advanced essentially the same claim Dunnivant now asserts. In Beasley, the plaintiff asserted unlawful *1584 interference with his business relations where defendant/contractors refused to do business with the plaintiff and told other construction companies that if they accepted bids from the plaintiff, the defendants would not give any bids to these companies in the future. The Alabama Supreme Court held that these allegations were insufficient. The court added that “[c]om-petition in business, even though carried to the extent of ruining a rival, constitutes justifiable interference in another’s business relations, and is not actionable....” Beasley, 134 So.2d at 429; see, e.g., Battles v. San Ann Service, Inc., 441 So.2d 925, 928 (Ala.Civ.App.1983). In light of this authority, we are persuaded that Dunni-vant cannot recover on his state tort claim.
CONCLUSION
Although summary judgment should be used cautiously in antitrust cases, the district court correctly granted the appellees’ motions in this case. Poller v. CBS, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). To permit an agreement to be inferred merely from the existence of complaints, or even from the fact that a termination resulted from such complaints, could deter or emasculate legitimate conduct. Monsanto, 465 U.S. at 763-64, 104 S.Ct. at 1470-71; see also Sharp, 108 S.Ct. at 1520. As the Supreme Court correctly noted in Cities Service:
While we recognize the importance of preserving litigants’ rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.
Cities Service Co., 391 U.S. at 290, 88 S.Ct. at 1593.
Because we find no concerted activity, Dunnivant’s procedural claim against supplier/Mid-State is dismissed as moot. Accordingly, the district court’s grant of summary judgment in favor of the appellees is affirmed.
AFFIRMED.

. Alabama Oxygen is not a party to this action.

. As in Monsanto, we do not suggest that complaints in antitrust cases have no probative value. We only suggest that the burden of proof remains on the antitrust plaintiff to introduce sufficient evidence to exclude the possibility of independent action. See Monsanto, 465’ U.S. at 764 n. 8, 104 S.Ct. at 1471 n. 8.

. Notwithstanding the district court’s interpretation of the proper legal standard, this court must independently review the district court’s order granting summary judgment. Thrasher v. State Farm Fire & Casualty Co., 734 F.2d 637, 638 (11th Cir.1984).

. "CarQuest" represents a specific line of automotive parts.

. We are cognizant of Dunnivant’s assertion that he has no business interest in the adjacent garage; however, this contention is irrelevant to our analysis. Our focus is centered on whether the suppliers autonomously exercised unilateral action.

. In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (in banc), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.