INTERNATIONAL LOGISTICS GROUP, LTD.; Aargus Truck and Automotive Supply, Inc.; Guardian Auto Supply, Inc., Plaintiffs–Appellants,

v.

CHRYSLER CORPORATION, Defendant–Appellee.

No. 88–1610.

United States Court of Appeals, Sixth Circuit.

Argued March 23, 1989.

Decided Sept. 7, 1989.

Rehearing and Rehearing En Banc Denied Nov. 2, 1989.

James R. Safley (argued), Stanford Robins, Susan Rester Miles, Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., G. Reynolds Sims, Eric R. Bryen, Sims & Kaplan, Farmington Hills, Mich., for plaintiffs-appellants.

Helen R. Haynes, Pepper, Hamilton & Scheetz, Richard A. Rossman, Pepper, Hamilton & Scheetz, Detroit, Mich., Laurence Z. Shiekman (argued), Philip H. Lebowitz, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Paul R. Eichbauer, Highland Park, Mich., for defendant-appellee.

Before KRUPANSKY and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Plaintiffs-appellants International Logistics Group, Ltd. (ILG), Aargus Truck and Automotive Supply, Inc. (Aargus), and Guardian Auto Supply, Inc. (Guardian) have appealed from the district court's order which granted defendant-appellee Chrysler Corporation's (Chrysler) motions for summary judgment and directed verdict, disposing of the plaintiffs' antitrust action against Chrysler. ILG, Aargus, and Guardian are owned and operated through stock ownership by Theodore Henke (Henke) and engaged in buying and reselling Chrysler manufactured and compatible automotive replacement parts for use in Chrysler manufactured vehicles.

This antitrust lawsuit charged Chrysler with an alleged conspiracy to restrain trade in violation of § 1 of the Sherman Act (Count I) and with the attempted monopolization of the resale of Chrysler manufactured replacement automotive parts to Chrysler franchised dealers and to the government in violation of § 2 of the Sherman Act (Count II).[1]

After identifying the relevant product aftermarket for replacement Chrysler automotive parts as a market supplied by Chrysler and some 2,400 other independent manufactures and/or suppliers of compatible Chrysler replacement parts, the trial court granted Chrysler's motion for partial summary judgment on the § 2 Sherman Act claims (Count II) concluding that appellants failed to prove that Chrysler attempted to monopolize or monopolized the product market because Chrysler's share of the identified market was limited to 20%.

On February 4, 1988, the district court granted Chrysler's motion for a directed verdict at the close of the evidence on the

1. Chrysler replacement parts are parts which are actually manufactured by Chrysler or by its licensees from Chrysler dies and fixtures. For purposes of this opinion, all such parts shall be referred to as "Chrysler manufactured parts."

remaining restraint of trade violations charged under § 1 of the Sherman Act, asserting that appellants had failed to prove that Chrysler's policies imposed upon the resale of its replacement parts were designed to restrict the resale of its products, or to have an *inter* brand anticompetitive effect upon the resale of its replacement parts. On May 17, 1988, judgment was formally entered in favor of Chrysler on Count I. Appellants initiated the instant timely appeal.

Upon review of the appellant's assignments of error, the record in its entirety, the briefs of the parties, and the arguments of counsel, this court affirms the decision of the trial court for the reasons articulated here and in Judge DeMascio's opinion.

■ Appellants' characterization of Chrysler's marketing policies for its Power Master engines as per se violations of §§ 1 and 2 of the Sherman Antitrust Act is misplaced. The record disclosed that the implemented marketing policies were "vertical" nonprice restraints imposed by Chrysler upon its distributors' marketing policies that were directed to competitors at different levels of competition. Although some minimal horizontal competitive effects may have resulted, the marketing policies concerning the Power Master engine were not directed toward or designed to impose restraints upon parties at the same competitive level even though Chrysler, the manufacturer, was also a distributor. *Business Elec. Corp. v. Sharp Elec. Co.*, 485 U.S. 717, 108 S.Ct. 1515, 1522–23 & n. 4, 99 L.Ed.2d 808 (1988).

Appellants' arguments have been rejected by current legal pronouncements addressing the subject, including the Department of Justice, which has stated in its vertical restraint guidelines:

> Some companies choose total vertical integration into distribution rather than reliance on contracts with independent distributors, and, in such cases, vertical integration may well be more efficient and lead to lower prices to consumers.

> \* \* \* \* \* \*

Situations involving dual distribution have sometimes erroneously been characterized as horizontal, and subjected to a per se analysis, because the supplier also acts as dealer. However, the fact that a supplier also engages in distribution does not make a restraint "horizontal." Accordingly, vertical restraints involving dual distribution will be analyzed in the same manner as other vertical restraints.

Department of Justice, Vertical Restraint Guidelines, § 2.2, 50 Fed.Reg. 6263, 6265 (1985) [hereinafter DOJ, Vertical Restraint Guidelines]. *See also Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215 (8th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

Accordingly, the vertical restraints imposed by Chrysler's marketing policies must be judged by the criteria of a "rule of reason" analysis rather than the rubic of "per se" illegality.

Integral to a "rule of reason" analysis is a review of the evolution of the controversial marketing policies.

Interparts, a division of Chrysler, marketed the Power Master engine exclusively for the international market. In an effort to remain competitive in this market, Interparts sold Power Master engines for export and internationally at unit prices which were substantially below the domestic unit price of the engine. During July through September of 1981 appellants Aargus and ILG purchased Power Master engines from Chrysler's Interparts division at overseas prices ostensibly for export and overseas resale. However, instead of exporting the engines appellants Aargus and ILG sold them to their sister corporation, appellant Guardian, a Henke corporation, which resold the engines to Chrysler dealers at prices substantially below Chrysler's prices to its domestic dealers.

Subsequent to Chrysler's numerous efforts to induce Henke and his corporations to conform with Chrysler's Power Master export program and to desist from reselling the discounted export units to Chrysler domestic dealers which Henke refused to do, Chrysler and Interparts cancelled all

orders for Power Master engines from Henke-owned corporations.

 Applying the "rule of reason" analysis to determine the existence of a § 1 Sherman Antitrust violation, a plaintiff must prove (1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy. *See Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir.1988). In the instant case, appellants have failed to satisfy the first elements of the test and, accordingly, a directed verdict on the § 1 Sherman Antitrust claim was appropriate.

To satisfy the imposed burden of proof, appellants were required to preponderate the evidence to support a conclusion that Chrysler did not act independently in formulating and implementing its Power Master marketing policies. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The record in the case at bar disclosed that the marketing policies which Chrysler attached to its Power Master engine were unilaterally formulated and uniformly implemented as to all distributors of Power Master engines with the proviso that Chrysler would reject all purchase orders from distributors who refused to comply with the marketing conditions. Current legal precedent supports the conclusion that a conspiracy may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source.

Moreover, under the scenario of this case, there were no legal restraints against Chrysler's unilateral acts because Chrysler needed no acquiescence from its dealers or its distributors in formulating marketing conditions for its Power Master unit which is exclusively manufactured; consequently, no basis existed which attached credibility to a conclusion of conspiracy. There can be no conspiracy "where the actor imposing the alleged restraint does not … need the acquiescence of the other party or any quid pro quo from him." 6 P. Areeda, *Antitrust Law* ¶ 1402b4, at 16 (1986).[2] Department of Justice guidelines addressing vertical restraints have approved the argument that it is inappropriate to consider intraband restraints as "agreements" to conspire and manufacturers are permitted to *unilaterally* impose appropriate restraints without giving rise to a cognizable antitrust violation:

> [I]t is inappropriate to treat intraband agreements in the same manner that other horizontal agreements are treated. Such restraints can have no effect that could not also be obtained through the unilateral action of the manufacturer of the particular brands in question.

DOJ Vertical Restraint Guidelines § 2.1, at 6265. The district court properly relied upon this principle, adopted in *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74, 79–80 (6th Cir.1981) (where conspirator merely exercises its "unilateral power," no antitrust "concerted action" is possible even if defendant forced others to "unwillingly acquiese" in defendant's restraints). Accordingly, appellants have failed to prove a conspiracy and consequently failed to satisfy the first element of the *Bucyrus–Erie* Rule of Reason analysis.

Appellants charged § 2 Sherman antitrust violations are equally misconceived. The trial court correctly concluded that appellants failed to sustain their burden of defining and proving the relevant product market and proving that Chrysler's market

**2.** See *Beach v. Viking Sewing Mach. Co.*, 784 F.2d 746, 750 (6th Cir.1986) (no concerted activity existed where manufacturer merely enforced "uniform policy" which it unilaterally formulated). *See also Dunnivant v. Bi–State Auto Parts*, 851 F.2d 1575, 1580 (11th Cir.1988) (where manufacturer had independent motivation for terminating plaintiff distributor and did not contact competitor of plaintiff until after it had reached its decision, no antitrust conspiracy was alleged); *Culberson, Inc. v. Interstate Elec. Co.*, 821 F.2d 1092, 1094 (5th Cir.1987) (no conspiracy existed where manufacturer formulated policy *before* it had contacts with dealers).

share reflected monopoly power or an attempt to achieve such power. *Smith v. Burns Clinic Med. Center, P.C.*, 779 F.2d 1173, 1176 (6th Cir.1985). Recently, the Supreme Court admonished that "[r]etail market power ... should not be assumed but rather must be proved." *Business Elec.*, 108 S.Ct. at 1521 n. 2. In particular, existing legal pronouncements have instructed that the relevant product market must include "those products or services that are either (1) identical to or (2) available substitutes for the defendants' product or service." *White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir.1983) (quoted in *A.I. Root Co. v. Computer/Dynamics, Inc.*, 806 F.2d 673, 675 (6th Cir.1986)). Thus, as the district court concluded, appellants' burden was to present evidence that no reasonable substitutes "for parts for use by Chrysler dealers" were available. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F.Supp. 1306, 1310 (N.D.Ohio 1980) (if products have interchangeable uses, they are in the same product market).

■ Obviously, Chrysler's sales to its dealers must be immediately excluded from the definition of relevant product market in the instant case. Chrysler could have unilaterally required its franchised dealers to purchase their parts exclusively from Chrysler. Thus the dealer market existed at Chrysler's option. Chrysler could not be charged with restraining trade in this market. *See Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir.1986), *cert. denied*, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (where a monopolist permits competition to exist and later refuses to allow competition, no antitrust liability is generated). Moreover, a manufacturer cannot be charged with antitrust violations if it monopolizes its own brand, e.g., monopolization of Power Master engines or Chrysler manufactured parts. A manufacturer is entitled to the benefits of maintaining a "monopoly" over products which it has developed and produced. Indeed, if manufacturers were denied a monopoly over their own unique products, the incentives for innovation and development of beneficial products would

be stifled. Accordingly, Chrysler committed no § 2 Sherman Act violation when it implemented its marketing programs for its Power Master engines or its own manufactured parts. Monopolization of a single brand is not an antitrust violation. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir.1984) (absent exceptional market conditions, one brand in market of numerous brands cannot constitute relevant product market); *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 244–45 (6th Cir. 1982) (Chrysler products are not relevant market); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1228 (10th Cir. 1986). As the Department of Justice noted:

> [A]pplication of this market definition procedure normally will lead the Department to include more than a single brand of a product in the market. In most cases, there is significant competition among competing brands of a product, and defining a product market to correspond to a single brand of a product would yield unrealistic answers to the Department's economic analysis.

DOJ Vertical Restraint Guidelines § 6.1, at 6272.

■ For the reasons hereinbefore discussed and those articulated by the trial court, appellants' antitrust charges anchored in Chrysler's edict to dealers and distributors that it would terminate all sales of Power Master engines and Chrysler manufactured parts to its dealers and/or distributors who entered competitive bids with it for the sale of Chrysler manufactured parts to the government do not rise to the level of cognizable § 1 and § 2 Sherman antitrust action.

This court finds no merit in appellants' effort to declare the government, as a purchaser of Chrysler manufactured replacement parts, a separate geographic market which was monopolized or was attempted to be monopolized by Chrysler through its sales policies in violation of § 2 of the Sherman Antitrust Act.

The record reflected that the government's specifications incorporated into its invitation to bid for replacement vehicle parts embraced Chrysler manufactured and Chrysler compatible parts. Absent a government imposed distinction between Chrysler manufactured replacement parts and Chrysler compatible replacement parts, albeit the government represents a purchaser of magnitude, it is without unique characteristics that would support its consideration as a separate geographic market. Here again, appellants have failed to support their charges with proof of sufficient weight to give credibility to their assertions. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F.Supp. 1306, 1310 (N.D.Ohio 1980).

The government is but a single purchaser within the overall market. As the Fifth Circuit recently noted:

Jayco asks us to limit arbitrarily the geographic market to a single purchaser, a limitation that, because of Savin's large share of the government's business, would allow Jayco to assume what it must prove. As a matter of common sense a single purchaser of a product cannot generally be considered a relevant market, lest we wish to clothe each and every sale with an antitrust suit.

*Jayco Systems, Inc. v. Savin Business Mach. Corp.*, 777 F.2d 306, 320 (5th Cir. 1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986) (footnote omitted). Likewise, the Seventh Circuit has decided that the loss of contracts with a single government purchaser is not cognizable as an antitrust injury. In *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir.1980), the court decided as follows:

[T]here must be some allegation of a harmful effect on a more generalized market than TVA. *See George R. Whitten, Jr. [v.] & Paddock Pool Builders, Inc., supra*, 508 F.2d [547] at 562 [1st Cir.1974]. Otherwise the mere fact that one party bid successfully against another party for a contract would be equivalent to an anticompetitive effect and would raise the specter of an antitrust action being used as a remedy for any

tortious conduct during the course of the competition. This would be contrary to the repeated view of the Supreme Court that the antitrust laws do "not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945).

This court has considered appellants' remaining assignments of error and concludes that they are without merit. Accordingly, the opinion of the district court is AFFIRMED in its entirety.

WELLFORD, Circuit Judge, concurring:

I concur in the opinion of Judge Krupansky, but write separately to set out and emphasize parts of the decision of Judge Robert E. DeMascio that seem to me to compel the result reached in this appeal.

I. *Section One Sherman Act Claim*

First, the district judge properly held that *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74 (6th Cir.1981), was "pertinent to the issue whether there is evidence of any agreement between Chrysler and others to prevent the plaintiffs from selling Chrysler parts to the United States government." *Barnosky* stands for the proposition that there is no "coerced" agreement where the plaintiffs "would add nothing to the defendant's ability to achieve its own ends through *unilateral* action." (Emphasis added). Judge DeMascio then held that:

[It is] clear that Chrysler merely delayed its quotations, slowed its deliveries, and then finally stopped quoting altogether. These actions alone were what hampered ILG's ability to complete for Government business. Chryler did not approach Mr. Henke and ask him not to bid on Government business, nor is there any evidence that it asked the Government to boycott ILG. It is not an antitrust violation to try to persuade a customer that a competitor is not supplying the exact product for which the customer has asked. The defendant is therefore entitled to a di-

rected verdict in its favor on the issue of whether an agreement existed to prevent Plaintiffs from selling Chrysler brand parts to the Government. There simply is no evidence to support a finding of such an agreement.

I agree that plaintiffs have failed in this particular with respect to the Section One claim.

In assessing the relevant market, the district judge properly observed that other retailers (K–Mart, Sears, and the like) were part of the relevant market contrary to the assertions fo plaintiffs' expert, Dr. Glennie. The court stated:

> The fact is that both dealers and other retailers are competing to obtain the same product (Chrysler compatible parts) to sell to the same customers (owners of Chrysler vehicles). Both the dealers and K–Mart respond to the same consumer demands, and therefore, both place the same demands on Chrysler and other suppliers of compatible parts. The dealers and K–Mart bid against each other to obtain the same products, and they then bid against each other to sell the same products to owners of Chrysler vehicles.
>
> Plaintiff Aargus' inability to sell "genuine parts" to one class of retailers did not prevent it from selling those same parts to all other retailers; those other retailers were, in both the technical and colloquial sense, *in the market for* the same product that Aargus complained it could not sell to dealers, and they sought that product for the same reason. An assessment of the harm to competition, therefore, must consider these competing retailers as part of the relevant market that has allegedly been injured.

(Emphasis in original).

Judge DeMascio noted that the plaintiffs' faulty market definition, irrespective of the existence of an agreement, would prevent a finding that Chrysler unreasonably impeded competition:

> The Court has already stated our finding that there is no evidence that Chrysler acted other than unilaterally with respect to Plaintiffs' attempts to sell Chrysler brand parts to the Government.

But, even if there were proof of an agreement, regarding sales to the Government, such a supposed agreement has not been shown to be unreasonable because, again, Plaintiffs' evidence of unreasonableness relies on an incorrect market definition.

Judge DeMascio made a detailed analysis of the "government market" as a relevant market theory advanced by plaintiffs and the case authority submitted by plaintiffs to support their theory. I agree with the conclusion reached that plaintiffs failed under the proof submitted.

## II. *Section Two Sherman Act Claims*

The district court first set out the requirements imposed upon a plaintiff making a Section Two antitrust claim:

> To establish a Section 2 violation of the Sherman Act, Plaintiff must show that Chrysler has actually monopolized or has attempted to monopolize trade or commerce in a relevant market. Actual monopolization under Section 2 has two elements: the possession of monopoly power in the relevant market and the willful acquisition or maintenance of that power in that relevant market. *U.S. v. Grinnell Corporation*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966).
>
> In order to prove attempt to monopolize, Plaintiffs must show that Chrysler engaged in anticompetitive conduct, that it did so with specific intent to monopolize a relevant market, and that there is a dangerous probability of it succeeding in that attempt. *White & White, Inc. v. American Hospital and Supply Corp.*, 723 F.2d 495, 506–07 (6th Cir.1983); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir. 1982).

He discussed further the relevant product market in respect to a Section Two assertion in light of the proof developed:

> The alleged inability of competing suppliers of Chrysler compatible parts to sell to dealers does not restrict their ability to reach other retailers, because these other retailers bid for the parts in the same market as dealers. Thus, Chrys-

ler's power in "the market" is its power in the market populated by all retailers of Chrysler compatible parts, not merely dealers.

. . . .

We conclude therefore that the most relevant market is the market for all Chrysler compatible parts sold at retail level. The existence of monopoly power in the market is ordinarily inferred from the defendant's predominant share of business in the market. *Grinnell,* 348 U.S. at 571, 86 S.Ct. at 1704. In an attempt to monopolize context, on the other hand, a plaintiff must show that Defendant possesses "market power that approaches monopoly power." *Richter,* 691 F.2d at 826.

The most recent year for which complete statistics are available is 1985. In that year, American automobile owners spent a total of $57.7 billion on parts. Based on corresponding auto sales statistics, it is estimated that $6.2 billion (10.9% of the total) was spent on parts for Chrysler vehicles. The sales of "genuine" Chrysler parts, however, account for only 20.5% of the $6.2 billion spent by Chrysler owners. (The figures for previous years are similar, and show that Chrysler had slightly under a 20% market share.) *See* Rollins affidavit. Despite the fact that Chrysler was able to capture a lion's share of its dealers orders for spare parts, close to 80% of Chrysler owners were willing and able to buy spare parts that did not come from Chrysler. Chrysler competitors in the parts trade, therefore, had the far greater part of the market, even with the difficulties that allegedly hindered competition for the business of dealers.

. . . .

Such conduct is illegal (under Section 1) only if it is done in an agreement with others; or under Section 2, only if the actor is, or there is a dangerous probability the actor will become, a monopolist. The acts protects competition not competitors. Unilateral conduct that increases one's market shares from 15.6% to 20.5% does not threaten competition, no matter how unpleasant it might be for those competitors at whose expense the increase is achieved.

Again, in discussing the "government market" or submarket advocated by plaintiffs with regard to the Section Two cause of action, the district judge properly concluded on the question of danger of monopolization from Chrysler that:

Even if the Court assumes that there does exist a separate relevant market for Chrysler compatible parts that conform to Government specifications, it is clear that Chrysler neither monopolizes nor does it pose a danger of monopolizing that market. For each of the years 1984 through 1986, the Government purchased between $16.7 million and $19.7 million worth of spare parts that Chrysler could have supplied, but Chrysler in fact supplied only 21% to 24% of these totals. *See* Spornhauer affidavit. In other words, the Government is only slightly more likely than the individual Chrysler owner to buy a "genuine" Chrysler part when it needs a Chrysler compatible part.

. . . .

For whatever reason, Chrysler leaves over 60% of the business to competing suppliers of the relevant product. Of the remaining 40% of the government's business for which it competes, competitors are able to capture about one-third. Hence, over 75% of the relevant market remains for Chrysler competitors. There is, therefore, no dangerous probability of Chrysler monopolizing this market. This conclusion is reinforced by the fact that Chrysler's share of the government market is very stable, and may even be declining as a result of the government's recent emphasis on price over "quality" pursuant to the Competition in Contracting Act.

The district judge in his opinion considered all the evidence submitted at trial and delivered a thorough and reasoned analysis before concluding that either a directed verdict or a judgment should be rendered for Chrysler. I, therefore, affirm for the reasons stated by the district court. Judge Krupansky has further set out a

sound basis for affirmance in which I concur.